**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ICONIX INTERNATIONAL INC. f/k/a
ICONIX BRAND GROUP, INC.,

*Plaintiff*,

v.

NEIL COLE,

*Defendant*.

**COMPLAINT**

Case No. 26cv2558

**Jury Trial Demanded**

Plaintiff Iconix International Inc. ("Plaintiff," the "Company," or "Iconix"), through its undersigned counsel, asserts the following claims and alleges as follows:

**INTRODUCTION**

1.      Defendant Neil Cole is a former CEO of Iconix who took advantage of his position to deceive the Company's auditors, regulators, and shareholders about Iconix's financial condition by engaging in an overpayments-for-givebacks scheme to falsely inflate Iconix's financial condition.  Cole's conduct led to an indictment, a federal jury finding Cole guilty of securities fraud and making false filings to the Securities and Exchange Commission ("SEC"), an SEC investigation, and the filing of multiple derivative and class actions.  It also allowed Cole to reap tens of millions of dollars through stock sales made while he was concealing his scheme.

2.      Despite the serious financial and reputational harm and business disruption Cole caused the Company, his defense was primarily funded by Iconix, which acted in good faith throughout Cole's legal troubles to advance more than **$26 million** to pay for his many lawyers and advisors.  As is the usual course, that advancement was made subject to Company By-Laws and undertakings Cole signed that expressly prohibit him from keeping such funds if a final

adjudication or judgment establishes he acted in bad faith and/or with active and deliberate dishonesty.

3.      Although Cole's conviction ultimately was vacated on procedural grounds, his bad faith is unquestionable, and he should be required to repay the millions Iconix advanced to fund his defense.  The mountain of facts that led a jury to determine Cole's guilt beyond a reasonable doubt did not disappear when his conviction was vacated on double jeopardy grounds, and that voluminous record supports a finding of Cole's bad faith, especially under the preponderance of the evidence standard applicable here.

4.      The facts that led to Cole's conviction, including sworn testimony and an extensive documentary record, show that Cole entered an agreement with a business partner pursuant to which that partner overpaid for Iconix's licenses.  Cole and that business partner then arranged for a secret side-agreement in which Iconix would subsequently give a portion of the payment back to the partner.  The overpayment was intended to fraudulently inflate the revenue and earnings per share numbers reported to the SEC and Iconix's investors.

5.      Cole signed and approved quarterly filings with the SEC that he knew did not disclose the improper planned givebacks.  Indeed, as the federal judge who presided over Cole's criminal trials opined: "I believe that you [Cole] knew that the two transactions involved had no economic substance.  I believe that you entered into those transactions knowing that you would be paying back the $5 million and $6 million.  I believe that you did that because of your desire to have the Company meet its revenue market consensus—consensus revenue targets, as it had for so many quarters before, and you did it for that reason." *United States v. Cole*, No. 19-cr-869 (S.D.N.Y.), ECF No. 316 at 34–35.

2

6.      Cole's wrongful actions—made in bad faith and with active and deliberate dishonesty—have imposed extensive costs on Iconix.  In fact, recovery of funds advanced to Cole for his defense will barely begin to compensate the Company for the harm Cole caused. Not only did Iconix advance tens of millions to Cole for the defense of his own misconduct, but the Company was forced to spend thousands of hours and expend many more millions of dollars in attorneys' fees to investigate the nature and scope of Cole's fraudulent scheme, defend itself in the SEC's and DOJ's years-long investigations of Cole's scheme, as well as in related shareholder class actions and derivative actions (leading to considerable settlement payments), incur audit expenses and *restate* its earnings for 2013, 2014, and the first two quarters of 2015— all of which were reported when Cole was responsible as President and CEO—and suffer irreparable harm to the Company's reputation, its share value, and the value of its brands.

7.      Cole refuses to reimburse the Company for the amounts advanced.  In fact, in a transparent hope that the best defense is a good offense, Cole is suing Iconix for even *more* money in a case that is doomed to fail for reasons including his own misconduct.  *See Cole v. Iconix Int'l Inc. et al.*, Case No. 1:25-cv-09357-MKV (S.D.N.Y.).  Cole should not be permitted to add insult to injury by keeping the tens of millions of dollars Iconix advanced him for legal fees and costs spent to defend the very misconduct that harmed the Company, nor should he be permitted to claim additional fees.

8.      Cole's refusal presents an actual controversy requiring judicial resolution. Accordingly, Iconix brings these claims to recover the millions advanced to Cole, as the Company By-Laws, undertakings, and other relevant agreements require.  Specifically, Iconix seeks (1) a declaratory judgment that Cole acted in bad faith and/or with active and deliberate dishonesty, and is therefore not eligible under Iconix's By-Laws for indemnification of his legal

fees and associated costs, and (2) an order requiring Cole to repay the over $26 million in legal fees and related defense costs Iconix advanced pursuant to its contractual obligations. Iconix brings these claims seeking a determination that a preponderance of the evidence shows Cole acted in bad faith and/or with active and deliberate dishonesty, requiring the return of the tens of millions of dollars advanced to him by Iconix, and precluding further indemnification to Cole.

## PARTIES

9. Iconix is a Delaware corporation with its principal place of business in Florida.

10. Cole is, on information and belief, a resident of New York.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332(a)(1), as this action involves citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. The Court has personal jurisdiction over Defendant Cole because, on information and belief, he resides in and transacts substantial business within the state of New York and this district, and because a substantial part of the events giving rise to the claims occurred in New York.

13. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because there is already a pending action between the Parties in this Court, and because Defendant is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

14. Iconix (f/k/a Candie's, Inc.) is a premier brand management company that owns and licenses a diversified portfolio of global consumer brands across the fashion, sports, and

4

home goods sectors.[1]  Iconix specializes in marketing, merchandising, and licensing its brand portfolio, and has over 500 licensees with leading manufacturers and retailers worldwide that sell across various distribution channels from the mass market to the luxury market, as well as through various online outlets.

15.    Neil Cole served as President, CEO, and Chairman of the Board of Directors of Iconix from 1993 through 2015.  His tenure as CEO was characterized by a costly litany of government investigations into misconduct under his stewardship of the Company.  He ultimately was ousted from his leadership roles at Iconix when his fraudulent inflation of the Company's revenue numbers and submission of false statements to the SEC came to light and resulted in restatement of historical financial disclosures made under his leadership.

## I.    Cole's Long History of Misconduct

16.    The misconduct that ultimately spelled the end of Cole's career with Iconix was not his first foray into the unscrupulous.  Cole is a serial scofflaw.  Since the early years of his leadership of the Company, regulators and the courts have repeatedly found that Cole violated federal law while serving as CEO of Iconix.

17.    For instance, the SEC determined that Cole oversaw accounting fraud at Iconix between 1997 and 1999, designed to improve the Company's publicly reported financial condition.  The SEC found that Cole was provided with indications that Iconix was improperly recognizing revenue through the use of improper bill-and-holds but failed to investigate or stop the practice.  The SEC further found that Cole signed documents filed with the SEC that improperly recorded the Company's revenue and income generated by these schemes.  The SEC determined that, even after auditors raised questions with Cole about these issues and indicated

---

[1]    Until 2005, Iconix's predecessor company operated under the name "Candie's, Inc."  Candie's, Inc. is referred to as Iconix or the Company in this pleading.

that Iconix's failure to address them made them unable to complete their audit, Cole nevertheless authorized a materially misleading press release about the Company's earnings.  In light of this misconduct, the SEC found that Cole caused violations of Sections 10(b), 13(a), and 13(b) of the Securities Exchange Act, as well as Rules 10b-5, 12b-20, 13a-13, and 13b2-1 thereunder.  In 2003, the SEC issued a cease-and-desist order containing these findings.  Cole consented to the entry of the cease-and-desist order and paid a substantial civil penalty to the SEC.

18.     But Cole's misconduct did not stop there.  In 2007, the Federal Trade Commission ("FTC") and Antitrust Division of the Department of Justice ("Antitrust Division") brought a lawsuit against Iconix in the U.S. District Court for the District of Columbia arising out of Cole's submission of a false statement to the FTC.  The complaint in that case alleged that when Iconix acquired licensing rights related to a clothing brand, Cole personally signed a Notification and Report Form filed with the FTC, attesting to its accuracy and completeness.  Shortly thereafter, the Antitrust Division opened an investigation into the acquisition and discovered the inaccuracy of Cole's sworn statement.  The Court entered judgment in favor of the Government and ordered Iconix to pay a civil penalty amounting to over half-a-million dollars.

## II.     Cole's Fraudulent Conduct, Criminal Conviction, and Ultimate Evasion of Criminal Accountability

19.     These sanctions imposed by federal regulators did not deter Cole from continuing to act in bad faith.  From 2014 to 2015, Cole abused his position as President and CEO of Iconix to actively and deliberately mislead the Company's auditors and misrepresent the Company's financial condition.

20.     Starting in 2014, a preponderance of the voluminous evidence shows that Cole engaged in a scheme to falsely inflate Iconix's reported revenues and earnings per share through fraudulent overpayments-for-givebacks deals negotiated with a Hong Kong-based joint venture

6

("JV") partner, Global Brands Group Asia Limited ("GBG"), involving the Southeast Asia region. The scheme involved two deals: a June 2014 joint venture ("SEA-2") and a September 2014 joint venture ("SEA-3"). Cole executed the scheme so that Iconix could hit quarterly revenue and earnings numbers and fraudulently convey the impression to the investing public that Iconix was growing quarter after quarter, as Cole had touted to the market.

21.     Cole ordinarily employed joint ventures to profit from Iconix's brands in foreign markets. In a typical JV arrangement, Cole had Iconix create a subsidiary, transferred ownership of a trademark or brand to that subsidiary, and then transformed the subsidiary into a JV by selling a 50 percent ownership interest in the JV to another business pursuant to a joint venture agreement. As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue.

22.     From an accounting perspective, when Iconix entered into a JV, Iconix recognized as revenue the purchase price paid to Iconix by the JV partner, less Iconix's cost basis in the trademarks. Accordingly, a higher price paid to Iconix by the JV partner meant Cole would have Iconix report more revenue on its financial statements. The buy-in consideration Iconix received from its JV partners constituted a significant portion of Iconix's earnings under Cole's leadership.

23.     Cole's overpayments-for-givebacks scheme took advantage of that fact by secretly and misleadingly inflating the reported amount paid to Iconix by one JV partner: GBG. In the SEA-2 and SEA-3 deals, Cole induced GBG to agree to pay an inflated buy-in price for its interest in the JV—the overpayment. GBG did so because Cole made a commitment to return the excess amount of the payments to GBG at a later date—the giveback. Cole then hid the

inflated purchase from Iconix's attorneys and auditors and reported these artificially high revenue numbers in SEC filings.

### A.  *Cole's SEA-2 Scheme*

24.     In October 2013, Cole directed Iconix to enter into a JV with GBG called the Southeast Asia JV ("SEA-1").  In the following months, Cole negotiated an amendment to the JV—SEA-2—involving an interest in certain Iconix trademarks in Korea and Europe.

25.     During negotiations over SEA-2, Cole reached a secret, unwritten agreement with GBG in which GBG would inflate the buy-in purchase price to be paid to Iconix by $5 million (from approximately $10.9 million to approximately $15.9 million) in exchange for Iconix giving approximately $5 million back to GBG falsely designated as marketing payments.

26.     Cole negotiated SEA-2 with the intent to secretly and falsely inflate Iconix's revenue and earnings per share numbers.

27.     Cole signed the agreement underlying SEA-2 in June 2014.  The SEA-2 purchase agreement included the inflated price but omitted Cole's giveback commitment.  Cole's undisclosed, undocumented agreement for Iconix to pay back $5 million of the deal price was not accounted for in Iconix's books when the deal was finalized.

28.     In September 2014, GBG submitted sham invoices to Iconix for purported marketing costs totaling approximately $5 million.  Some of the invoices concerned brands that did not relate to SEA-2.  Cole rejected the sham invoices and advised GBG that it needed to send more realistic-looking invoices.  GBG revised the invoices to make them seem more credible and resubmitted them to Iconix.  In November and December 2014, Cole then authorized payments to GBG amounting to approximately $5 million.  These payments were not consideration for

bona fide marketing work but were actually givebacks arising out of Cole's secret agreement with GBG.

29.    Cole concealed his giveback agreement with GBG, including from Iconix's attorneys and outside auditors.  The Form 10-Q Iconix filed with the SEC for the second quarter of 2014 ("2014 Q2 10-Q"), which Cole signed as President and CEO, disclosed that GBG agreed to pay Iconix $15.9 million as a result of SEA-2 and calculated the cost basis-adjusted revenue of $13.6 million.  The 2014 Q2 10-Q that Cole signed failed to disclose that he had inflated Iconix's revenue by approximately $5 million based on GBG's overpayment.  It also failed to disclose that Cole promised to repay $5 million to GBG in purported consideration for marketing services.

### B.    Cole's SEA-3 Scheme

30.    In the summer of 2014, Cole negotiated a second amendment to SEA-1— SEA-3—which involved the sale of interests in certain Iconix brands in Hong Kong, Taiwan, China, and Macau.

31.    Here too, Cole negotiated SEA-3 with the intent to clandestinely and falsely inflate Iconix's revenue and earnings per share numbers.

32.    And like with SEA-2, Cole arranged for GBG to overpay for the SEA-3 deal by approximately $6 million and for Iconix to give that overpayment back to GBG.  Specifically, Cole and GBG agreed upon inflating the buy-in price from approximately $15.5 million to approximately $21.5 million in exchange for Iconix's commitment to reimburse the $6 million to GBG at a later date.

33.    In September 2014, Cole signed the agreement underlying SEA-3.  The SEA-3 purchase agreement provided that GBG would pay approximately $21.5 million for its interest in

the JV.  SEA-3 did not document the commitment to give approximately $6 million back to GBG.  Cole did not account for his undisclosed, undocumented agreement for Iconix to pay back $6 million to GBG in Iconix's books when the deal was finalized.

34.     Cole concealed the SEA-3 giveback agreement with GBG, including from Iconix's auditors and attorneys.  The Form 10-Q Iconix filed with the SEC for the third quarter of 2014 ("2014 Q3 10-Q"), which Cole signed, disclosed that GBG agreed to pay Iconix $21.5 million as a result of SEA-3 and calculated the cost basis-adjusted revenue of $18.7 million.  The 2014 Q3 10-Q failed to disclose that Iconix's revenue from SEA-3 was inflated by approximately $6 million based on GBG's overpayment.  It also failed to disclose that Cole promised to give $6 million back to GBG.

35.     After executing the SEA-3 purchase agreement, Cole sold one million shares of Iconix stock at $39.51 per share, resulting in a gross gain of approximately $40 million.

36.     Cole's fraudulent revenue inflation from SEA-2 and SEA-3 helped Iconix avoid missing analyst consensus for its quarterly revenue in the second and third quarters of 2014, as well as the analyst consensus for its annual revenue for the full year 2014.

C.     *Cole's Indictment, Conviction, and Sentencing*

37.     In December 2019, the United States Attorney's Office for the Southern District of New York filed an Indictment in *United States v. Cole* (the "Criminal Action"), criminally charging Cole with one count of conspiracy to commit securities fraud, to make false filings with the SEC, and to improperly influence the conduct of an audit (the "Conspiracy Charge"); one count of securities fraud; six counts of making false filings with the SEC; one count of improperly influencing the conduct of audits (the "Substantive Counts"); and one count of

10

conspiracy to destroy, alter, and falsify records in federal investigations.  No. 19-cr-869 (S.D.N.Y.), ECF No. 1.

38.    On October 5, 2021, the parties proceeded to trial on the charges in the Indictment.  *See id.*, ECF Nos. 144–180.  The trial concluded with Cole's acquittal on the Conspiracy Charge, but the jury could not reach a verdict on the Substantive Counts.

39.    The Government did not dismiss the case and instead sought a retrial on the Substantive Counts.  *Id.*, ECF No. 187.  In the lead-up to Cole's retrial, his counsel moved to withdraw rather than continuing to represent him, and the court granted the motion.  *Id.*, ECF No. 192.

40.    On October 31, 2022, the Government retried Cole on the Substantive Counts.  *See id.*, ECF Nos. 253–285 ("Trial Tr.").  The Government called 17 witnesses at trial.  Iconix's former COO, Seth Horowitz, admitted in his testimony that, with respect to SEA-2 and SEA-3, "[w]e inflated the prices of the joint ventures with promises of givebacks in order to hit our financial goals."  Trial Tr. at 651:24–25, ECF No. 261.  GBG executive Jason Rabin testified that GBG overpaid for SEA-2 and SEA-3 because, with respect to SEA-2, "Neil [Cole] said if I raised the price by $5 million, we could bill it back for marketing," and, with respect to SEA-3, Cole said "if the price gets raised by $6 million, we could beat [one brand's] shortfall or offset [that brand's] shortfall."  *Id.* at 406:6–7, 411:18–20, ECF No. 259.  Another GBG executive, Jared Margolis, testified similarly about the overpayments.  *Id.* at 1710:2–18, 1717:2–10, 1761:7–9, ECF Nos. 271, 273.

41.    A unanimous jury found Cole guilty beyond a reasonable doubt of each Substantive Count.  *See* No. 19-cr-869 (S.D.N.Y.), ECF No. 252.

42.     The Court sentenced Cole to 18 months' imprisonment and three years of supervised release.  At sentencing, United States District Judge Edgardo Ramos applied an obstruction-of-justice enhancement based on Cole's perjury during his testimony.  In so doing, Judge Ramos opined, "I sat through both trials.  I saw Mr. Horowitz and Mr. Cole testify both times, and I have to say I believed Mr. Horowitz.  I believed the version of facts that he told.  I think it was consistent with the documents that were put into evidence, the testimony of Mr. Margolis and Mr. Rabin, notwithstanding their disclaiming any liability or any wrongdoing.  ***Specifically, I did not credit Mr. Cole's testimony that he had very little role in negotiating these joint ventures; that, you know, to the extent that anything untoward happened, it was all Mr. Horowitz's doing.***"  *Id.*, ECF No. 316 at 8–9 (emphasis added).

43.     Judge Ramos continued, "***I believe that you [Cole] knew that the two transactions involved had no economic substance.  I believe that you entered into those transactions knowing that you would be paying back the $5 million and $6 million.***  I believe that you did that because of your desire to have the Company meet its revenue market consensus—consensus revenue targets, as it had for so many quarters before, and you did it for that reason."  *Id.* at 34–35 (emphasis added).

**D.     *Cole's Appeal Does Not Negate the Underlying Facts***

44.     Cole appealed his conviction on Fifth Amendment double jeopardy grounds.  *See United States v. Cole*, No. 23-07566 (2d Cir.), ECF No. 30.  The Second Circuit reversed the judgment of the District Court and remanded the case with instructions to vacate Cole's convictions on the basis that Cole's acquittal for conspiracy during the first trial precluded retrial on the Substantive Counts.  *United States v. Cole*, 158 F.4th 113 (2d Cir. 2025).  Notably, the court was silent as to the sufficiency of the evidence underlying Cole's conviction.

45.    Cole is also subject to an SEC action initiated in December 2019 (the "SEC Action"), *SEC v. Cole et al.*, No. 19-cv-11148 (S.D.N.Y.).  During the pendency of the criminal case against Cole, the SEC case against Cole was stayed.  The SEC alleges violations of the Securities Exchange Act of 1934 and the Securities Act of 1933 for the scheme.  On January 30, 2026, the parties to that case notified the Court in the SEC Action that Cole's conviction was vacated but requested that the stay be extended pending settlement discussions.  The court granted the request to continue the stay.  *See id.*, ECF No. 71.

### E.    *Iconix's Advancement of Cole's Legal Fees and Expenses*

46.    Pursuant to Cole's Employment Agreement and the Company's By-Laws, Iconix advanced Cole legal fees and related expenses throughout the course of the SEC and DOJ investigations of Cole's conduct, the SEC's litigation against him, and his two criminal trials. Iconix did so in good faith, reserving its right to recoup its payments upon a final adjudication of whether Cole acted with bad faith and/or with active and deliberate dishonesty.  As of this filing, no court or other tribunal has ruled that Cole's actions did *not* constitute bad faith and/or active and deliberate dishonesty, as contemplated by the Company By-Laws and agreements governing the parties' respective rights concerning Cole's indemnification.  In accepting these payments, Cole signed multiple undertakings promising to pay the Company back if it was later determined that he was not entitled to indemnification under the By-Laws.  *See infra* ¶¶ 60–62.

47.    On October 10, 2021, Cole filed a lawsuit in the Commercial Division of the New York County Supreme Court, seeking an order compelling Iconix to advance additional fees. *See* Case No. 655837/2021, NYSCEF Doc No. 1.  That case concerned a dispute about the reasonableness of the fees billed, not Cole's entitlement to fees.  The court in that case did not determine one way or another whether Cole acted in bad faith or with active and deliberate

dishonesty. *See id.*, NYSCEF Doc. No. 32; *see also id.*, NYSCEF Doc. No. 31 at 30:4–5. The court's order regarding the advancement at issue in that case was clear: "Nothing in this Order shall be deemed to constitute a waiver by Iconix . . . of any rights or remedies it may have in connection with Mr. Cole's demands for advancement or indemnification and/or invoices . . ." *Id.*, NYSCEF Doc. No. 32 at 5. The parties settled the case without admissions by either party while preserving Iconix's right to enforce its By-Laws.

48. Upon Cole's conviction, Iconix sent Cole a letter reminding him of his obligation to preserve his assets and informing him of the Company's intention to recover the advanced fees.

49. Cole has not reimbursed Iconix for the advanced fees and expenses.

50. On November 10, 2025, Cole instead brought a meritless lawsuit against Iconix brazenly seeking *even more* money to cover his alleged legal expenses, among other requested relief. Those claims should be rejected due to Cole's bad faith and lack of entitlement to indemnification.

## III. Valid, Enforceable Contracts Between the Parties Bar Indemnification upon a Finding of Bad Faith or Active, Deliberate Dishonesty

51. All of the agreements governing Iconix's indemnification of Cole incorporate the Company's By-Laws. The By-Laws make clear that an officer or director, like Cole, is *not* entitled to indemnification where a judgment or final adjudication establishes that he acted in bad faith or with active and deliberate dishonesty. Cole also signed multiple undertakings affirming that he would return any fees or expenses advanced if it was subsequently determined that he was not entitled to indemnification under the By-Laws.

**A.    *The By-Laws***

52.    Article VII 2(a) of Iconix's By-Laws provides, in pertinent part, that the corporation will indemnify each officer and/or director thereof involved in "any action, suit, claim or proceeding, . . . investigation, . . . or any other actual, threatened, pending or completed proceeding, whether criminal or civil, . . . by reason of the fact that such officer and/or director . . . (i) is or was a director or officer of the corporation, or (ii) while serving as a director or officer of the corporation, is or was serving, at the request of the corporation, as a director, officer, or in any other capacity, of any other Enterprise, against any and all judgments, fines, penalties, amounts paid in settlement, and expenses, including attorneys' fees, actually and reasonably incurred as a result of or in connection with any Proceeding, except as provided in Section 2(c) of this Article VII."

53.    Article VII, Section 2(c) of the By-Laws states, in pertinent part: "*No indemnification shall be made to or on behalf of any Indemnities if a judgment or other final adjudication adverse to him or her establishes that such Indemnities acts were committed in bad faith or were the result of active and deliberate dishonesty* and were material to the cause of action so adjudicated, or that such Indemnitee personally gained in fact a financial profit or other advantage to which he or she was not legally entitled" (emphasis added).

54.    Moreover, Article VII, Section 2(b) of the By-Laws provides that "[e]xpenses, including attorneys' fees" shall only be paid by the Company "upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation."

**B.    *Cole's Employment Agreement***

55.    In 2008, Iconix and Cole entered into a written employment agreement, which

was subsequently amended that same year (as amended, the "Employment Agreement").

56.     Under Section 1.2 of the Employment Agreement, Cole was obligated to "faithfully and diligently discharge his duties" and to "devote all of his business time, attention, knowledge and skills faithfully, diligently and to the best of his ability, in furtherance of the business and activities of" Iconix.

57.     Under Section 8 of the Employment Agreement, the parties agreed that "the Company shall indemnify and hold harmless the Executive and his heirs and representatives as, and *to the extent, provided in the Company's by-laws*" (emphasis added).

**C.      *Cole's Separation Agreement***

58.     In 2016, Iconix and Cole entered into a separation agreement (the "Separation Agreement").

59.     Under Section 10 of the Separation Agreement, Iconix agreed that it continued to be bound by Section 8 of the Employment Agreement "*to the extent set forth in the Company's by-laws* as in effect" at the time of Cole's resignation from Iconix (emphasis added).

**D.      *The Undertakings***

60.     When Iconix advanced attorneys' fees and other related expenses to Cole, he signed an undertaking (as required by Article VII, Section 2(b) of Iconix's By-Laws) stating that he would repay the Company if it was ever determined that he was not entitled to indemnification under the By-Laws.  *See supra* ¶ 54.

61.     In a written undertaking (the "First Undertaking"), Cole agreed to repay the fees and expenses advanced by Iconix on his behalf if it was ultimately determined that he was not entitled to indemnification *under the By-Laws*.

62.    In a subsequent written undertaking dated January 2022 (the "Second Undertaking" and collectively with the First Undertaking, the "Undertakings"), Cole agreed to repay the fees and expenses advanced by Iconix on his behalf if it was ultimately determined that he was not entitled to indemnification *under the By-Laws*.

**E.    *The Advancement Agreement***

63.    In June 2022, Cole and Iconix entered into an agreement regarding the advancement of legal fees concerning the criminal action brought against him in the United States District Court for the Southern District of New York (the "Advancement Agreement").

64.    Section 1 of the Advancement Agreement capped Iconix's obligations for Cole's legal fees at $5 million.

65.    In Section 4 of the Advancement Agreement, Cole acknowledged that the Undertakings remained in full force and effect.  The Undertakings incorporate the By-Laws and require Cole to repay the Company if it is determined that he is not entitled to indemnification. *See supra* ¶¶ 60–62.

66.    In accordance with its indemnification obligations under the By-Laws, Iconix paid over $26 million to cover the fees and costs of Cole's attorneys and other professionals in connection with the defense of the Criminal Action and/or the SEC Action.

67.    Cole's acts that were the subject of the Criminal Action and/or the SEC Action were committed in bad faith and/or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, and Cole personally gained a financial profit or other advantage to which he was not legally entitled.

68.    Thus, Cole was not entitled to indemnification under the By-Laws because he acted with bad faith and/or with active and deliberate dishonesty.  Iconix is entitled to recoup

advancement upon a final adjudication in this action establishing that bad faith and/or active and deliberate dishonesty.

69.     Cole seeks to continue to harm Iconix by incurring additional legal expenses, seeking indemnification he is not entitled to, and refusing to return advanced legal expenses to which he is not entitled.

## COUNT I
### (Declaratory Judgment:
### Cole Acted in Bad Faith and/or with Active and Deliberate Dishonesty)

70.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

71.     The Declaratory Judgment Act authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration" in "a case of actual controversy within its jurisdiction."  28 U.S.C. § 2201.

72.     An actual, ripe, and justiciable controversy exists between the parties as to whether Cole is entitled to indemnification by Iconix under the By-Laws, Employment Agreement, Separation Agreement, Undertakings, and Advancement Agreement because Cole alleges that he is entitled to indemnification and that Iconix breached those agreements.  *See Cole v. Iconix Int'l,. et al.*, Case No. 1:25-cv-09357-MKV (S.D.N.Y.), ECF No. 1 at 13–15.

73.     Iconix denies that Cole is entitled to indemnification pursuant to the By-Laws (or the Employment Agreement, Separation Agreement, Undertakings, and Advancement Agreement) because he acted in bad faith and/or with active and deliberate dishonesty.

74.     Cole was not entitled to indemnification because his acts with respect to the overpayments-for-givebacks scheme were committed in bad faith and/or were the result of active

18

and deliberate dishonesty and are material to this cause of action, and because Cole personally gained a financial profit or other advantage to which he was not legally entitled.

75.    Cole is not entitled to indemnification because his acts with respect to conduct underlying the Criminal Action and/or SEC Action were committed in bad faith and/or were the result of active and deliberate dishonesty and are material to this cause of action, and because Cole personally gained a financial profit or other advantage to which he was not legally entitled. Iconix seeks a declaration that, upon a final adjudication in this action, Cole is not entitled to indemnification and, accordingly, must repay all advanced fees and expenses.

76.    Iconix has no adequate remedy at law other than an action for declaratory judgment to determine the parties' respective rights and obligations under the By-Laws.

77.    Iconix is entitled to a declaration that Cole is not entitled to indemnification under the By-Laws.

## COUNT II
### (Breach of Contract:
### By-Laws, Employment Agreement, Undertakings, and Advancement Agreement)

78.    Iconix repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

79.    The Employment Agreement, Undertakings, and Advancement Agreement are valid and binding contracts that incorporate the By-Laws.

80.    Iconix performed its obligations under the By-Laws, Employment Agreement, Undertakings, and Advancement Agreement by advancing legal fees to Cole.

81.    The By-Laws provide that "[n]o indemnification shall be made if a judgment or other final adjudication adverse to him or her establishes that such Indemnitee's acts were committed in bad faith and/or were the result of active and deliberate dishonesty and were

19

material to the cause of action so adjudicated, or that such Indemnitee personally gained in fact a financial profit or other advantage to which he or she was not legally entitled."

82.    Cole is not entitled to indemnification because he acted in bad faith and/or with active and deliberate dishonesty with respect to the conduct underlying the Criminal Action and SEC Action.

83.    Cole is therefore required to reimburse Iconix for the legal fees and costs advanced to date upon a final adjudication establishing such bad faith, including a final adjudication in this action.

84.    Cole breached the By-Laws and the Undertakings by failing to repay Iconix the amounts it paid his lawyers and other professionals in connection with the Criminal Action and the SEC Action.

85.    As a result of Cole's breach, Iconix has been damaged in an amount to be determined at trial, but in no event less than $26 million, plus pre- and post-judgment interest, costs, and such further relief as the Court deems just and proper.

**COUNT III**
**(In the Alternative, Unjust Enrichment)**

86.    Iconix repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

87.    This Count is pled in the alternative, pursuant to Fed. R. Civ. P. 8(d).

88.    To the extent any court determines that the parties' written agreements do not govern, do not apply to, or otherwise do not provide a complete remedy with respect to some or all of the legal fees, costs, and expenses advanced by Iconix on Cole's behalf, Iconix is entitled to recover under principles of unjust enrichment.

20

89.     Iconix conferred a direct and substantial benefit upon Cole by paying attorneys' fees to fund Cole's defense and related proceedings, including by making payments to Cole's counsel and other professionals in connection with the Criminal Action and/or the SEC Action.

90.     Cole accepted and retained the benefit of those funds.

91.     Cole has demanded and continues to demand that Iconix bear and/or reimburse those defense costs, and he has refused to return the advanced funds following Iconix's demand for repayment.

92.     At equity, Cole should not be permitted to retain the benefit of the legal fees Iconix advanced, to the extent they were incurred as a result of, or in connection with, Cole's bad faith conduct and/or active and deliberate dishonesty, and/or to the extent Cole is not entitled to indemnification for such expenses.

93.     As a result of Cole's unjust enrichment, Iconix has been damaged in an amount to be determined at trial, but in no event less than $26 million, plus pre- and post-judgment interest, costs, and such further relief as the Court deems just and proper.

94.     Iconix respectfully requests judgment against Cole on this Count, awarding restitution and disgorgement of the Advanced Expenses in an amount to be proven at trial (but in no event less than $26 million), together with pre- and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

## **RELIEF SOUGHT**

WHEREFORE, Iconix requests the following relief:

(a)     declaratory judgment be entered that Defendant Cole acted in bad faith and/or with active and deliberate dishonesty and is not entitled to indemnification, and that, upon final adjudication, he must repay the advanced fees and expenses described herein;

21

(b)      damages against Cole of an amount not less than $26,000,000 and an award of pre- and post-judgment interest;

(c)      judgment be entered in favor of Iconix on all Counts of Iconix's Complaint;

(d)      Iconix be awarded all costs and attorneys' fees as permitted by law; and

(e)      such other and further legal and/or equitable relief as the Court may deem necessary or appropriate.

Dated:  New York, New York           MORRISON & FOERSTER LLP
        March 27, 2026


                                     By: *Jamie A. Levitt*
                                     Jamie A. Levitt, Bar No. 2548477
                                     JLevitt@mofo.com
                                     Michael D. Birnbaum, Bar No. 3068129
                                     MBirnbaum@mofo.com
                                     250 West 55th Street
                                     New York, NY 10019-9601
                                     Telephone: 212.468.8000
                                     Facsimile: 212.468.7900

                                     *Attorneys for Plaintiff*
                                     *Iconix International Inc.*